WILLIAM P. BARR
Attorney General
ERIC S. DREIBAND
Assistant Attorney General
SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement Section
R. TAMAR HAGLER (CA State Bar No. 189441)
Deputy Chief, Housing and Civil Enforcement Section
ANNA MEDINA (DC Bar No. 483183)
Acting Deputy Chief, Federal Coordination and Compliance Section
MEGAN K. WHYTE DE VASQUEZ (DC Bar No. 1000419)
MICHELLE A. MCLEOD (DC Bar No. 1032704)
CHRISTOPHER D. BELEN (VA Bar No. 78281)
ALYSSA C. LAREAU (DC Bar No. 494881)
Trial Attorneys
 U.S. Department of Justice, Civil Division
 950 Pennsylvania Ave. NW – 4CON
 Washington, D.C. 20530
 Telephone: (202) 514-4713, Facsimile: (202) 514-1116
 Email: Megan.Whyte.de.Vasquez@usdoj.gov
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
Chief, Civil Division
KAREN P. RUCKERT (CA State Bar No. 315798)
Chief, Civil Rights Section, Civil Division
MATTHEW NICKELL (CA State Bar No. 304828)
KATHERINE M. HIKIDA (CA State Bar No. 153268)
Assistant United States Attorneys
 Federal Building, Suite 7516
 300 North Los Angeles Street
 Los Angeles, California 90012
 Telephone: (213) 894-8805, Facsimile: (213) 894-7819
 E-mail: Matthew.Nickell@usdoj.gov
Attorneys for Plaintiff United States of America

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>CITY OF HESPERIA, COUNTY OF SAN BERNARDINO, and SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT,<br><br>  Defendants. | Case No. 5:19-cv-02298 AB (SPx)<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Hon. André Birotte, Jr.<br>United States District Judge |

# FIRST AMENDED COMPLAINT

Plaintiff, the United States of America ("United States"), alleges as follows:

## I.    INTRODUCTION

1.    The United States brings this action to enforce Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601–3631 (the "Fair Housing Act" or "FHA"). The United States brings this action pursuant to 42 U.S.C. § 3612(o) following an investigation and charge of discrimination by the Department of Housing and Urban Development ("HUD") and an election by Defendant City of Hesperia ("Hesperia" or the "City") to proceed in federal district court.

2.    The United States also brings this action pursuant to 42 U.S.C. § 3614(a), because Defendants Hesperia, the County of San Bernardino, California ("San Bernardino County" or the "County"), and the San Bernardino County Sheriff's Department (the "Sheriff's Department"), a law enforcement agency that is part of the County, separately and collectively have engaged in a pattern or practice of discrimination against residents and prospective residents of Hesperia because of race and national origin. This discrimination denied rights to a group of persons and such denial raises an issue of general public importance under 42 U.S.C. § 3614(a).

3.    The United States also brings this action pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7; the Title VI implementing regulation issued by HUD, 24 C.F.R. Part 1; and Title VI contractual assurances, because Defendant Hesperia discriminated against residents and prospective residents of Hesperia on the grounds of race and national origin.

4.    In November 2015, the City—with substantial support from the Sheriff's Department, which provides the City's local police services—enacted an ordinance mandating that rental property owners evict their tenants if the Sheriff's Department notified them that a tenant engaged in any purported criminal activity on or near the property. The ordinance also mandated criminal background checks and Sheriff's Department screenings for tenants, and annual inspections of rental properties by the

Sheriff's Department. Although the City purportedly enacted the ordinance to reduce crime, its true purpose was to address a so-called "demographical problem" by driving African American and Hispanic or Latino ("Latino") renters from their homes and from Hesperia and by deterring other African Americans and Latinos from moving to the City.

5. The Sheriff's Department, which the City tasked with enforcing the ordinance, exercised its substantial discretion to target African American and Latino renters, as well as renters who lived in majority-minority areas of Hesperia. It demanded evictions of entire families for conduct involving one tenant or even guests or estranged family members, evictions of victims of domestic violence, and evictions in the absence of concrete evidence of criminal activity. It also threatened and took action against housing providers that failed to evict tenants under the ordinance's strictures.

6. Defendants enacted and enforced the ordinance with the intent and effect of disproportionately impacting African American and Latino renters.

## II.   JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 42 U.S.C. §§ 3612(o), 3614(a), 42 U.S.C. §§ 2000d to 2000d-7, 24 C.F.R. § 1.8(a), and 28 C.F.R. § 42.108.

8. Venue is proper under 28 U.S.C. § 1391(b) because conduct giving rise to the United States' allegations occurred in the Central District of California, and Defendants are located in the Central District of California.

## III.   DEFENDANTS

9. Hesperia is a municipal corporation located in the County of San Bernardino, California, which is in the Central District of California.

10. Hesperia is governed by a five-member City Council and a City Manager whom the City Council appoints.

11. The City's programs and activities receive federal financial assistance, including from HUD.

12.    As a recipient of federal funds, the City is responsible for ensuring—and it has made contractual assurances that it will ensure—that the programs or activities to which it distributes those funds, including programs administered by the City Council and Sheriff's Department, comply with federal law.

13.    San Bernardino County is a municipal corporation located in the Central District of California.

14.    The County is governed by a five-member Board of Supervisors and a Chief Executive Officer whom the Board of Supervisors appoints.

15.    The Sheriff's Department is a law enforcement agency funded and operated by San Bernardino County.

16.    Hesperia contracts with San Bernardino County for law enforcement services. Pursuant to that contract, the Sheriff's Department provides local police services to the City.

## IV.    FACTUAL ALLEGATIONS

**A.    The City—with substantial support from the Sheriff's Department—enacted the mandatory eviction ordinance to address a perceived "demographical problem": the growing population of African American and Latino renters in Hesperia.**

### 1.    Changing Demographics in Hesperia

17.    Hesperia is located north of the Los Angeles National Forest in the Victor Valley region of the Mojave Desert in San Bernardino County.

18.    The African American and Latino population in Hesperia grew rapidly in the late 20th and early 21st centuries while the percentage of non-Hispanic white residents declined. In 1990, non-Hispanic white residents were 76.8% of the City's population, but by 2000, this had dropped to 62.4%. By 2010, Hesperia's non-Hispanic white population was 41.1%. According to Census Bureau estimates, the percentage of non-Hispanic whites in Hesperia had further declined to 35.8% by 2016.

19.     The number of Latino residents in Hesperia rose by 140% between 2000 and 2010, from 18,400 to 44,091. The number of African American residents rose by 103% during the same period, from 2,388 to 4,853. According to the 2010 Census, the City was 5.4% African American and 48.9% Latino.

### 2. Overview of the Ordinance

20.     On November 17, 2015, Hesperia enacted ordinance no. 2015-12, entitled "An Ordinance of the City Council of the City of Hesperia, California, Requiring the Registration and Regulation of Housing Rental Businesses for Crime Free Rental Housing." The ordinance went into effect on January 1, 2016, and remained in effect until on or about July 18, 2017.

21.     The ordinance applied exclusively to rental properties. It contained four core requirements relevant to the United States' claims.

a.     First, it required all owners of rental property in the City to register their properties and pay an annual fee, and it imposed fines for failure to register those properties. Under the City fee schedule for the ordinance, an owner had to pay a $350 fine for failing to register a single-family rental property, and a fine of $50 per unit for failing to register a multifamily property. The ordinance also made the failure to register or to comply with the provisions of the ordinance a misdemeanor.

b.     Second, it required owners to submit the names of all adult tenancy applicants to the Sheriff's Department for a background screening. In addition, it required owners to use a commercially available service to conduct a criminal background check of their tenants, at the owners' expense. The City fee schedule for the ordinance imposed a $250 fine for an owner's failure to screen a tenant or applicant.

c.     Third, it required all owners to incorporate a "Crime Free Lease Addendum" into all new and renewed residential leases. The City Council approved the addendum. The addendum mandated that if any occupant, guest, or "other person under the [occupant's] control" engaged in a single instance of any criminal activity "on or near" the property or, in the case of drug crimes, "at any location," this "w[ould] result in a

5

Three-Day Notice to Quit." Neither the ordinance nor the addendum required a conviction or other criminal disposition, or even an arrest, to trigger the three-day notice. The addendum allowed landlords to serve the three-day notice requiring that "every member of . . . [the] household . . . shall vacate the premises within three days."

d.      The City fee schedule for the ordinance imposed a $500 fine on owners for failure to initiate an eviction in accordance with the addendum, as well as a $250 fine for failure to incorporate the addendum in a lease.

e.      Fourth, the ordinance required all rental properties in the City to undergo annual police inspections for items related to actual or potential criminal activity, for example, whether poor lighting or landscaping offered places for individuals to hide. The City fee schedule for the ordinance provided a $100 fee for each reinspection and a $400 fine for failing to make any required corrections.

22.    The City amended the ordinance as of July 18, 2017, during HUD's investigation. The language of the ordinance changed, but the components of the crime-free rental housing program implemented under the original ordinance remain largely the same, although certain provisions are no longer mandatory. The current City fee schedule provides for many of the same fines under the amended ordinance as it did under the original ordinance.

### 3.      The City's Enactment of the Ordinance

23.    The ordinance's stated rationale was a purported connection between rental properties and increased "illegal activity" and "law enforcement calls for service." However, statements by City and Sheriff's Department officials leading up to the enactment of the ordinance belie this rationale.

24.    Instead, statements by City and Sheriff's Department officials indicate that the ordinance was enacted with discriminatory intent and with the purpose of evicting and deterring African American and Latino renters from living in Hesperia.

25.    In City Council hearings prior to the ordinance's enactment, the Mayor, Mayor Pro Tem, and other City Councilmembers made numerous statements that

demonstrate the City enacted the ordinance to reverse perceived "demographic" changes in Hesperia. During hearings, City officials focused on the places from which renters had moved when discussing the need to expel the perceived newcomers from Hesperia. Although approximately three-quarters of new Hesperia residents between 2012 and 2016 moved there from other parts of San Bernardino County, City Councilmembers focused many of their statements on purported newcomers from Los Angeles County, whose population in 2016 was estimated to be only 26.7% non-Hispanic white. For example:

a.     City Councilmember Russ Blewett stated the purpose of the ordinance was "to correct a demographical problem." He stated he "could care less" that landlords and organizations including "the Apartment House Association, and the Building Industry, and the Board of Realtors" disagreed with him about the ordinance, and stated that the City needed to "improve our demographic." Blewett also stated that "those kind of people" the ordinance would target were "no addition and of no value to this community, period," and that he wanted to "get them the hell out of our town," adding "I want their butt kicked out of this community as fast as I can possibly humanly get it done."

b.     The Mayor, Eric Schmidt, stated "I can't get over the fact that we're allowing . . . people from LA County" to "mov[e] into our neighborhoods because it's a cheap place to live and it's a place to hide." He also stated that "the people that aggravate us aren't from here," and that they "come from somewhere else with their tainted history."

c.     Mayor Pro Tem Bill Holland stated "[w]e are surgically going after those elements that create an inordinate amount of problems in every single neighborhood," and "[y]ou are trying to eliminate them, you are trying to pluck them out and make them go somewhere else." He also stated that the ordinance's purpose was to get each landlord "to rid his rental . . . of that blight," similar to "call[ing] an exterminator out to kill roaches, same difference."

d.     City Councilmember Mike Leonard stated that "we've had a lot of people from over the hill move up here that are not very friendly people," and "we need to work on getting them out of here." He also stated "[w]e need to get [the ordinance]

going because we are falling further and further behind on our ability to cut down some of our problem areas."

        e.    During a hearing on the proposed ordinance, Mayor Schmidt asked a property manager what percentage of his renters came from outside San Bernardino County. The property manager testified that people were moving from specific parts of Los Angeles County—all of which were well known as having significant minority populations, including the "323 area code" (which is concentrated in central Los Angeles city) and the cities of Compton, Inglewood, Long Beach, and Los Angeles. According to Census estimates, in 2016 the non-Hispanic white population in Compton was 1.1%; in Inglewood, it was 3.7%; in Long Beach, it was 27.7%; and in Los Angeles, it was 28.5%.

26.    Captain Nils Bentsen from the Sheriff's Department, who later became Hesperia's City Manager, was present at the hearings during which the statements described in Paragraph 20 were made.

27.    Captain Bentsen and the City Councilmembers described Hesperia's renters—a group in which African American and Latino individuals are overrepresented in comparison to their share of homeowners—as dangerous because they were "anti-social" and "victimized" homeowners. According to 2016 Census estimates, 58% of renter households in Hesperia were African American or Latino, compared to just 44% of homeowner households.

28.    Captain Bentsen and the City Councilmembers also disparaged Hesperia's Housing Choice ("Section 8") Voucher holders—three-quarters of whom were African American or Latino. For example, Councilmember Leonard stated the ordinance would "straighten . . . out" Hesperia's "issues with a lot of Section 8 housing," and told the other Councilmembers "[y]ou just pay more taxes to support these people that are sucking up the Section 8 housing," and added "[w]e need to get them out." Captain Bentsen compared the ordinance to his previous efforts evicting people in "a Section 8 house" where "it took us years to . . . find some criminal charges [and] arrest the people."

### 4. *The Sheriff's Department's Involvement in the Creation and Enactment of the Ordinance*

29.     The Sheriff's Department provided significant support and resources to help the City create and prepare to implement the ordinance before it was enacted.

30.     According to Hesperia's City Manager at the time, Mike Podegracz, Captain Bentsen was the "driving force" behind the ordinance. Bentsen testified in uniform before the City Council over six months before the ordinance's enactment "to see if the Council [was] willing to establish a mandatory [crime free rental] program." In his testimony, he cited data that he claimed showed a nexus between rental properties and increased crime. However, these data were misleading and incomplete, and he provided no testimony demonstrating that any of the data points were appropriate measures of crime rates:

a.     First, Bentsen claimed that in 2014 one-third of 911 calls in the City came from rental properties. But he failed to exclude from his data those 911 calls that were unrelated to criminal activity, and did not provide any additional data about the remaining 911 calls to enable the decision makers to determine whether the proportion of 911 calls coming from rental properties was disproportionate to the percentage of occupied housing units that were rental units (which was approximately 37% in 2014), and if so, by how much;

b.     Second, Bentsen cited the proportion of "multiple response" citations that the Sheriff's Department issued at rental properties. According to Bentsen, the Sheriff's Department issued "multiple response" forms when its officers had responded multiple times to a particular residence, including for loud music. Although Bentsen claimed that 80% of "multiple responses" from law enforcement were for rental properties, he omitted from his count those "multiple responses" involving alarm calls, which typically occurred at homes. Bentsen also did not testify about the circumstances in which the Sheriff's Department issued "multiple response" forms; and

c.     Finally, Bentsen asserted that nine of the ten homicides in Hesperia from 2012 through 2014 occurred at rental properties. He presented no statistics for other

types of crime, however, claiming that it would be "very difficult" and take "a lot of time" to compile the data necessary to determine whether crime rates for any other offenses vary depending on whether a property is owner- or renter-occupied. He asserted that he presented only data on homicides because that information "was an easier one for me to pull up because we don't have that many homicides, thank God."

31.     The Sheriff's Department began planning for an internal unit to enforce the ordinance before it was enacted. For instance, the Sheriff's Department "purchased Crime Free tracking software that allows the Sheriff's Department to quickly determine if a prospective tenant has been in violation of the Crime Free program anywhere in San Bernardino County."

32.     Captain Bentsen testified to the City Council that, "[u]nder Crime Free, you don't have to be convicted of a crime" to be evicted, and that "misdemeanor crimes [that are] mostly going unprosecuted . . . a good example is disturbances," could be enough to warrant eviction.

### 5.  Opposition to the Ordinance's Enactment and Enforcement

33.     The City enacted the ordinance despite objections from members of the community to many of its provisions. For example, the director of a property management company stated during a hearing that the ordinance was "trampling on civil rights." In addition, a group of realtors sent a letter to the City stating that, by "[t]aking the time of a Sheriff's Deputy to inspect a property," the ordinance would "keep[] that deputy from being able to actively protect the public from crimes." The realtors also suggested that the ordinance's purported crime-reduction objective would better be achieved if the City "could utilize existing data to identify where there have been higher incidents of crime, and could focus on addressing that issue in those areas."

34.     Defendants also disregarded a fair housing organization's letter stating that the ordinance "undermines law enforcement efforts, imposes unfair burdens on owners, conflicts with the City's fair housing obligations, and creates devastating effects on Hesperia residents who are most in need of law enforcement services." Councilmember

Blewett stated in response, "I don't care what fair housing says about" the people the ordinance targeted. Councilmember Paul Russ stated, "maybe we should go down to [the fair housing organization's offices] and start poking our noses in your business."

35.     Housing-related organizations continued raising civil rights and other objections after enforcement began. For instance, the California Apartment Association wrote the City that "many key provisions of the ordinance are unconstitutional, inconsistent with state law and subject owners to the risk of significant liability for fair housing violations and wrongful eviction." Another housing provider expressed concerns about the legality of the screening form and the addendum based on fair housing, civil, and privacy laws, and in advocating for revisions to those forms, told the Sheriff's Department that her company was "not willing to subject our clients or ourselves to the legal exposure the current documents represent." One housing provider stated that the ordinance "exposes landlords to significant civil liability," "does not provide tenants with adequate procedural protections, and also discriminates against renters and those the City has determined to be 'undesirable.'"

**B.     The Sheriff's Department—with the City's knowledge and assent—enforced the ordinance intentionally to evict and deny housing to African American and Latino renters.**

*1.   The City Granted Discretion to the Sheriff's Department*

36.     Captain Bentsen testified to the City Council that the ordinance was designed to be "lighter on the requirements and more heavy on the enforcement."

37.     The City tasked its "police department" and "Chief of Police"—i.e., the Sheriff's Department and a designated Sheriff's Captain—with enforcing the ordinance. Enforcement was specifically handled by a special Crime Free Housing Team within the Sheriff's Department comprising a deputy, a service specialist, and an office specialist.

38.     The ordinance made the Sheriff's Department the only entity with discretion to decide whether the ordinance required an eviction. It made the Sheriff's Department responsible for maintaining a "crime free" database and for sending crime notifications to

property owners. If the Sheriff's Department staff sent a crime notification to owners about their property, the ordinance mandated that the owners begin an eviction process.

39.     The Sheriff's Department exercised discretion in all aspects of enforcing the ordinance. Neither the ordinance nor the City provided much guidance to the Sheriff's Department regarding enforcement. The ordinance explicitly gave "discretion" to the "Chief of Police"—i.e., Sheriff's Department staff—to determine whether and what "evidence and documents" would be sent to housing providers notifying them to evict a tenant.

40.     Sheriff's Department staff stated that the ordinance was applied on a "case-by-case basis *of course*" (emphasis added), and that they "handl[ed] each situation differently" and applied "more of a 'spirit of the law' determination" than a fixed set of rules.

### 2.  Harsh Enforcement

41.     Under the ordinance, the Sheriff's Department routinely determined that tenants should be evicted despite the absence of any conviction or court judgment. Sheriff's Department staff stated that "a copy of the call [to 911] for service," a "negative Law Enforcement action [as opposed to a] conviction of a crime," or a "multiple response citation," which could be issued if the Sheriff's Department responded to a property multiple times for "noise disturbances" such as "loud music," could all trigger eviction.

42.     Even conduct that was legal under California state law could justify an eviction. Sheriff's Department staff explained to a housing provider, "even if your tenant has a [medical] marijuana card . . . they will be in violation of the Crime Free Program [even though a]s the police, we can't arrest someone for smoking marijuana who has a card."

43.     Sheriff's Department staff pressured property owners to ensure evictions took place and dedicated or offered to dedicate significant attention and resources to assist. For example, after a landlord served a notice to vacate on the landlord's tenants, Sheriff's Department staff told the landlord that "if they end up fighting it and going to court, we'd

be happy to accompany you." Sheriff's Department staff also offered to "speak to any problem tenants about their better options if they refuse to move after an arrest occurs."

44.     Sheriff's Department staff provided legal advice to owners to assist with evictions. For example, a Deputy Sheriff informed one landlord that "[i]f a tenant is evicted and you do not want them on the property, as long as you notify them they are not welcome we can move forward with a citizen's arrest," and "I would document the date and time they were advised not to return to the property."

45.     The Sheriff's Department also encouraged owners to use extra-judicial tactics to eject tenants from their homes. Sheriff's Department staff told a housing provider to use "whatever method fits the situation" to evict tenants, "as long as [the tenants] leave." Sheriff's Department staff encouraged the use of threats of eviction to get tenants to vacate through a "voluntary move," "especially after explaining that an official eviction could have a negative impact on their credit."

46.     The Sheriff's Department encouraged housing providers to evict entire households when one member of the household engaged in purported criminal activity. For example, a staff member told a housing provider, "[n]ot sure which one [of your tenants] was arrested, but under the new City Ordinance any arrest on the premises means the whole house is subject to eviction anyway." Sheriff's Department staff also demanded the eviction of an elderly Latino couple who lived in a majority-minority Census block after their adult son, who did not live with them, was arrested.

47.     The Sheriff's Department also notified landlords to begin evictions of victims of domestic violence even though the ordinance contained language purporting to protect them. For example, one woman was evicted together with her three children from a majority-minority Census block after she called 911 to report that her husband was beating her with a television cable. Sheriff's Department staff explained to another landlord that, under the ordinance, the Sheriff's Department "would be notifying you to begin eviction on the entire household" of a domestic violence victim "if the victim ends up allowing [the abuser] back in, and the problems persist." Also, the Sheriff's Department told the landlord

of an African American domestic violence victim that the victim "is allowing the problem to continue," and that the landlord could "warn [her] that if she allows [her husband] back in, and the problem persists, she would be subject to eviction."

48. Residents reported to HUD that they were scared to call the police due to the fear of eviction.

49. Evicting crime victims who called 911 undercuts Defendants' assertion that a principal purpose of the ordinance was to reduce crime and make neighborhoods safer.

50. Defendants retaliated against housing providers that hesitated to evict tenants as demanded by the Sheriff's Department. If owners did not begin evictions, the Sheriff's Department threatened them with fines. When a property management company raised concern about the ordinance's legality, the Sheriff's Department emailed the company's clients to inform them the company was noncompliant with the ordinance, and thus the City could fine the clients.

51. The City failed to exercise meaningful oversight over the Sheriff's Department in its enforcement of the ordinance.

52. The Sheriff's Department tracked the progress of the eviction campaign it directed with a document listing more than 250 people it had targeted for eviction and the status of their housing.

### 3. Disproportionate Enforcement Against African American and Latino Renters and Renters in Majority-Minority Neighborhoods

53. During its investigation, HUD obtained an "eviction tracking spreadsheet" from the Sheriff's Department purporting to list those residents and households that the Sheriff's Department had targeted for eviction in 2016 and the status of their housing. Based on an analysis of the residents on the spreadsheet whose race and national origin could be identified, HUD determined that African American and Latino renters were significantly more likely to be evicted under the ordinance than non-Hispanic white renters. Specifically, HUD determined that African American renters were almost four

times as likely as non-Hispanic white renters to be evicted because of the ordinance, and Latino renters were 29% more likely than non-Hispanic white renters to be evicted.

54.     The Sheriff's Department's data further show that 96.3% of individuals and 96.9% of households evicted under the ordinance had been evicted from majority-minority Census blocks, even though only 79% of rental households in Hesperia are located in majority-minority Census blocks.

55.     HUD further determined from the Sheriff's Department data that of the Census blocks in Hesperia with at least 25% renters and at least four rental units, 24% were majority-white, but only 2.5% of evictions occurred in those blocks.

56.     Moreover, HUD's analysis showed that the rate of evictions under the ordinance increased in relation to the percentage of minorities residing in the Census block. The higher the concentration of minority population in an area, the more likely households in that neighborhood were to be evicted under the ordinance.

57.     Defendants intended this disproportionate enforcement to drive African American and Latino renters out of their homes and out of Hesperia.

*4.  The Sheriff's Department's Screening Process*

58.     The ordinance, on its face, did not require housing providers to deny housing to applicants whom the Sheriff's Department "flagged" through the background screening process as having previously "violated rules of the Crime Free Rental Housing Program."

59.     However, the Sheriff's Department warned landlords about renting to tenants flagged during the screening process. For example, Sheriff's Department staff described such tenants as "potential future violators" to one housing provider, and cautioned another, "[y]ou just have to keep the consequences in mind along with the knowledge that you're renting to a previously bothersome tenant."

60.     Defendants also threatened some housing providers if they rented to tenants flagged through screenings. For example, the City informed a couple who owned four rental properties in Hesperia that they could be fined if they leased to applicants who were

flagged during the screening process. The couple denied the housing application of at least one Latino tenant because of the Sheriff's Department's screening.

61.     Sheriff's Department's screening reports generally did not provide information about why an applicant was flagged, and some housing providers simply denied housing to every applicant the Sheriff's Department flagged.

62.     The Sheriff's Department flagged at least 75 tenancy applicants during its screening process.

**C.     Defendants' actions were taken with intent to discriminate, and had the effect of discriminating, against African American and Latino individuals.**

63.     Defendants intended for the enactment and enforcement of the ordinance to drive African American and Latino renters out of their homes and out of Hesperia, and to discourage African American and Latino applicants from moving to Hesperia.

64.     The Sheriff's Department—with the City's knowledge and assent— enforced the ordinance in a harsh and arbitrary manner with the intent and effect of disproportionately evicting African American and Latino renters, as well as renters who lived in majority-minority neighborhoods.

65.     Defendants' discriminatory conduct resulted in particularly harsh consequences for African American and Latino renters and renters in majority-minority areas because of race and national origin.  Because of the Defendants' intentional race and national origin discrimination, African American and Latino renters were significantly more likely than non-Hispanic white renters to lose their homes because of the ordinance.

66.     As a result of Defendants' conduct as set forth above, many African American and Latino renters were unable to live in Hesperia because of their race or national origin.

**D.     Defendant Hesperia is a recipient of federal financial assistance.**

67.     At all relevant times described in this Complaint, Defendant Hesperia has been and continues to be a recipient of federal financial assistance from HUD.

68.     As a condition of receiving federal financial assistance, Defendant Hesperia, through its authorized representatives, certified that it agreed to comply with all requirements imposed by Title VI and HUD's regulation implementing Title VI.

69.     Title VI and HUD's implementing regulation prohibit discrimination, directly or through contractual or other arrangements, on the grounds of race, color, or national origin in any of a grant recipient or subrecipient's operations.

70.     Defendant Hesperia is responsible for ensuring that subsequent recipients, subgrantees, and contractors comply with the requirements of Title VI and its implementing regulation.

## V.     HUD ADMINISTRATIVE PROCESS

71.     On June 2, 2016, HUD's Assistant Secretary for Fair Housing and Equal Opportunity timely filed a complaint against Hesperia with HUD under 42 U.S.C. § 3610(a)(1)(A)(iii) alleging that the conduct described in paragraphs 1–66 above violated the Fair Housing Act, 42 U.S.C. §§ 3601–3631 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7. The Assistant Secretary filed a First Amended Complaint on November 17, 2016, adding the County and Sheriff's Department as respondents.

72.     In accordance with 42 U.S.C. §§ 3610(a) and (b), HUD conducted and completed an investigation of the complaint, attempted conciliation, and prepared a final investigative report.

73.     Based on the information gathered in its investigation, HUD determined, under 42 U.S.C. § 3610(g)(1), that reasonable cause existed to believe that Defendants had engaged in illegal discriminatory housing practices in violation of the FHA.

74.     On October 16, 2019, the Secretary of HUD issued a charge of discrimination under 42 U.S.C. § 3610(g)(2)(A), charging Defendants with engaging in unlawful discrimination in violation of the FHA.

75.     On November 1, 2019, Hesperia filed a notice of election to have the case heard in a civil action pursuant to 42 U.S.C. § 3612(a).

76.    On November 4, 2019, an Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District Court and terminated the administrative proceeding on the charge of discrimination.

77.    Following Hesperia's notice of election, the Secretary authorized the Attorney General to commence a civil action pursuant to 42 U.S.C. § 3612(o).

78.    On February 27, 2020, HUD notified the City that the City had failed to comply with Title VI and its implementing regulation, and that HUD would refer the Title VI matter to DOJ for enforcement if compliance could not be achieved by voluntary means.

79.    On April 9, 2020, HUD, concluding that it was unable to resolve the Title VI allegations voluntarily, referred the Title VI matter to DOJ for enforcement pursuant to 24 C.F.R. § 1.8(a) and 28 C.F.R. § 50.3.

80.    The United States has determined that all administrative requirements have been exhausted and that securing compliance cannot be achieved by voluntary means.

## VI.    FIRST CLAIM FOR RELIEF:
## DEFENDANTS' VIOLATIONS OF THE FAIR HOUSING ACT

81.    The United States re-alleges and herein incorporates by reference the allegations set forth in paragraphs 1–80 above.

82.    The rental properties the ordinance affected are all dwellings within the meaning of 42 U.S.C. § 3602(b).

83.    The conduct of Defendants described above constitutes:

a.    A denial of housing or otherwise making housing unavailable because of race and national origin, in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a);

b.    Discrimination in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race and national origin, in violation of Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b); and

c.      Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under Section 804 of the Fair Housing Act, in violation of Section 818 of the Fair Housing Act, 42 U.S.C. § 3617.

84.     The conduct of Defendants described above constitutes:

a.      A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, in violation of 42 U.S.C. § 3614(a); and

b.      A denial to a group of persons of rights granted by the Fair Housing Act, which raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

85.     Persons who were victims of Defendants' discriminatory practices, as well as individuals or entities that were injured by the discrimination against those victims, are aggrieved persons as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of Defendants' conduct.

86.     Defendants' conduct was malicious, intentional, willful, and/or taken with reckless disregard for the rights of others.

## VII.   SECOND CLAIM FOR RELIEF:
## DEFENDANT HESPERIA'S VIOLATION OF TITLE VI

87.     The United States re-alleges and herein incorporates by reference the allegations set forth in paragraphs 1–80 above.

88.     Defendant Hesperia receives federal financial assistance for its programs and activities, including from HUD.

89.     Defendant Hesperia has intentionally discriminated against residents and prospective residents of Hesperia on the grounds of race and national origin.

90.     Defendant Hesperia's intentional discrimination against individuals on the grounds of race and national origin violates Title VI and HUD's implementing regulation.

/ /

/ /

## VIII.  THIRD CLAIM FOR RELIEF:
## DEFENDANT HESPERIA'S VIOLATION OF TITLE VI ASSURANCES

91.    The United States re-alleges and herein incorporates by reference the allegations set forth in paragraphs 1–80 above.

92.    Defendant Hesperia signed contractual assurance agreements with the United States that all of its programs and activities receiving federal financial assistance would be conducted in compliance with all the requirements of Title VI and HUD's implementing regulation.

93.    Defendant Hesperia's intentional discrimination against individuals on the grounds of race and national origin violates Title VI and its implementing regulation.

94.    Defendant Hesperia therefore has violated its Title VI contractual assurances.

## IX.    RELIEF REQUESTED

WHEREFORE, the United States requests that the Court enter an ORDER that:

1.    Declares that Defendants' conduct violated the Fair Housing Act and Defendant Hesperia's conduct violated Title VI of the Civil Rights Act of 1964;

2.    Enjoins Defendants, their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with them from:

a.    Denying housing, or otherwise making housing unavailable because of race, in violation of 42 U.S.C. § 3604(a);

b.    Discriminating in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race in violation 42 U.S.C. § 3604(b); or

c.    Coercing, intimidating, threatening, or interfering with a person in the exercise or enjoyment of, or on account of her having exercised or enjoyed, or on account of her having aided or encouraged any other person in the exercise or enjoyment of, a right granted or protected by Section 804 of the Fair Housing Act, in violation of 42 U.S.C. § 3617;

4.    Enjoins Defendants from failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory or otherwise unlawful conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' discriminatory or otherwise unlawful conduct;

5.    Requires such action by Defendants as may be necessary to restore all persons aggrieved by Defendants' discriminatory housing practices to the position they would have occupied but for such discriminatory conduct;

6.    Awards appropriate monetary damages to all persons harmed by Defendants' discriminatory conduct, as authorized by 42 U.S.C. §§ 3612(o)(3), 3613(c)(1), 3614(d)(1)(B), and 42 U.S.C. §§ 2000d to 2000d-7; and

7.    Assesses civil penalties against Defendants under 42 U.S.C. § 3614(d)(1)(C) in order to vindicate the public interest.

The United States prays for such additional relief as the interests of justice may require.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

# DEMAND FOR JURY TRIAL

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.


Dated: September 10, 2020                           Respectfully submitted,

                                                    WILLIAM P. BARR
                                                    Attorney General

NICOLA T. HANNA                                     ERIC S. DREIBAND
United States Attorney                              Assistant Attorney General
Central District of California                      Civil Rights Division

DAVID M. HARRIS                                     SAMEENA SHINA MAJEED
Assistant United States Attorney                    Chief, Housing and Civil
Chief, Civil Division                               Enforcement Section

/s/ Karen P. Ruckert                                 /s/ R. Tamar Hagler
KAREN P. RUCKERT                                    R. TAMAR HAGLER
Assistant United States Attorney                    Deputy Chief, Housing and Civil
Chief, Civil Rights Section, Civil Division         Enforcement Section

/s/ Matthew Nickell                                 /s/ Megan K. Whyte de Vasquez
MATTHEW NICKELL                                     MEGAN K. WHYTE DE VASQUEZ
KATHERINE M. HIKIDA                                 MICHELLE A. MCLEOD
Assistant United States Attorneys                   CHRISTOPHER B. BELEN
Civil Rights Section, Civil Division                Trial Attorneys
                                                    United States Department of Justice
                                                    Civil Rights Division
                                                    Housing and Civil Enforcement Section

                                                    /s/ Anna Medina
                                                    ANNA MEDINA
                                                    Acting Deputy Chief, Federal Coordination
                                                    and Compliance Section

                                                    /s/ Alyssa C. Lareau
                                                    ALYSSA C. LAREAU
                                                    Trial Attorney
                                                    United States Department of Justice
                                                    Civil Rights Division
                                                    Federal Coordination and Compliance
                                                    Section

                                                    *Attorneys for the United States of America*